744 S.E.2d 538

Cassandra Regina CRAWFORD, Petitioner,

v.

CENTRAL MORTGAGE COMPANY, Respondent.

Appellate Case No. 2012–205608

James W.O. Warrington, Sr., Petitioner,

v.

The Bank of South Carolina, Respondent.

Appellate Case No. 2012–206826.

No. 27273.

Supreme Court of South Carolina.

Heard June 19, 2012.

Decided June 19, 2013.

David K. Haller of Haller Law Firm, of Charleston, for Petitioners, Cassandra R. Crawford and James W.O. Warrington, Sr.

Dean Anthony Hayes, of Korn Law Firm, P.A., of Columbia, for Respondent, Central Mortgage Co.; Mark S. Sharpe and John H. Warren, III of Warren & Sinkler, LLP, of Charleston, for Respondent, The Bank of South Carolina.

John T. Moore, Benjamin Rush Smith, III and Carmen Harper Thomas, all of Nelson Mullins Riley & Scarborough, of Columbia, for Amicus Curiae, South Carolina Bankers Association.

Samuel C. Waters, Reginald P. Corley, Jaclynn Bowers Goings and Mary R. Powers, all of Rogers Townsend & Thomas, of Columbia, for Amicus Curiae, Mortgage Bankers Association of the Carolinas, Inc.

## JUDGMENT FOR RESPONDENTS

Chief Justice TOAL.

These cases present the novel question of whether a loan modification constitutes the unauthorized practice of law. Cassandra Crawford and James Warrington (collectively, Petitioners) own properties facing foreclosure. Prior to these foreclosure actions, Petitioners obtained loan modifications from their respective lenders to extend their loans' maturity dates and receive additional time to pay. Petitioners failed to make timely payments under the modified loan terms, and now seek to prevent foreclosure by arguing that their lenders engaged in the unauthorized practice of law by modifying the loans without an attorney. We disagree, and hold that modifying a loan without the participation of an attorney does not constitute the unauthorized practice of law.

## FACTS/PROCEDURAL BACKGROUND

### I. Crawford

Crawford purchased a home in Mount Pleasant, South Carolina in 2005. She financed the purchase by obtaining a mortgage from Central Mortgage Company (Central). Under the terms of the 2005 loan documents, Crawford borrowed $290,000 with an adjustable interest rate of 7.875 percent per annum and agreed to make monthly payments of $1,903.13 for 360 months. A licensed attorney supervised the closing of the original note and mortgage.

Crawford failed to make timely payments on the original mortgage, and requested a loan modification from Central. Central approved her request by letter dated November 7, 2008. Central notified Crawford that the modification would reduce her interest rate from 7.875 percent per annum to a new fixed rate of 5.875 percent per annum for the remaining life of the loan, and extend the time to repay the loan until November 1, 2048. Central also informed Crawford that past-due payments, escrow shortages, and legal fees/costs would be capitalized, including a delinquent interest of $5,709.09 and escrow shortage of $718.65, for a total capitalization of $6,427.74. Central added this amount to Crawford's current

unpaid balance of $289,985.46, resulting in a new unpaid balance of $296,413.20.

Crawford took the notification and modification documents to the law firm that had closed her original loan and had the documents witnessed and notarized.[1] On November 17, 2008, an attorney at the law firm mailed the signed modification documents back to Central. Central recorded the loan modification on November 21, 2008, at the Charleston County Register of Deeds.

Crawford subsequently requested a second loan modification. On January 21, 2010, Central informed Crawford she was eligible for a second modification. Under the second modification agreement, the unpaid principal balance became $320,875.39, but the maturity date remained November 1, 2048. Central further reduced the interest rate on the loan from 5.875 percent per annum to 2.25 percent per annum for the first five years, 3.25 percent per annum for the sixth year, 4.25 percent per annum for the seventh year, and 5 percent per annum for the eighth through thirty-ninth years. The modification resulted in a monthly principal and interest payment ranging from $1,034.65 for years 1 through 5, and $1,490.72 for years 8 through 39. Crawford signed and executed the agreement in front of a notary as required by the loan documents. Under a document entitled "Attorney Selection Notice," Central informed Crawford that "[b]y signing below, it is understood and agreed that you may hire a lawyer or attorney to advise you regarding this transaction and its consequences." Crawford signed her acknowledgement of the notice on January 28, 2010, and returned the agreement to Central for recording. Crawford never hired an attorney, and Central admits that the loan modification agreement was not prepared by a licensed attorney.

---

1. Crawford and Central disagree as to whether the firm's attorney actually reviewed the loan documents with Crawford. Crawford "does not recall or believe that the 2008 modification was actually reviewed by an independent attorney," while Central claims that "a partner at the firm informed [Central's] counsel that the law firm's involvement would have included a review of the documents being signed." Central has chosen not to pursue this matter as this case concerns the second loan modification. Central acknowledges that the second modification, occurring in 2010, was not supervised by an attorney.

On July 14, 2010, Central filed a an action in the circuit court alleging Crawford defaulted on monthly mortgage payments since April 1, 2010, and seeking foreclosure of the mortgage. Crawford petitioned this Court for declaratory relief in the Court's original jurisdiction. On March 8, 2012, this Court issued an order granting Crawford's petition and expediting this matter for oral argument pursuant to Rule 245, SCACR.

## II. Warrington

Warrington purchased land on Goat Island in Charleston County and financed it with a commercial loan obtained from The Bank of South Carolina (the Bank). Warrington, a real estate investor, intended to develop the property by subdividing it into parcels for resale. Consequently, he obtained a variable rate loan from the Bank, set at the Bank's prime rate, and with interest-only payments due in two years' time. A licensed attorney oversaw the closing of the original note and mortgage.

Warrington could not make payment after the original note matured in November 2008. Warrington requested and received three successive loan modifications from the Bank to extend the loan maturity date and provide him additional time to pay. The first modification extended the maturity date to March 20, 2009, with interest-only payments required in the interim. Warrington's unpaid balance was $474,542.70, and his interest rate rose one-quarter percent to 4.25 percent per annum. The second modification extended the maturity date to October 20, 2009, again with payments to be made on an interest-only basis. The unpaid balance remained $474,542.70, but at an increased interest rate of 6 percent per annum. The third modification did not necessitate periodic interest payments but extended the maturity date of the loan to March 20, 2010, at which time all principal and interest was due in a single payment. The unpaid balance remained $474,542.70, but the interest rate increased to 6.5 percent.

The Bank prepared each of the three modification agreements using standard modification forms containing blanks. The Bank's employees filled in these blanks with input from various loan officers. The modification agreements were signed in the Bank's office and recorded by the Bank without

the participation of a licensed attorney. The Bank's employee primarily responsible for executing the modification agreement testified he did not give any legal advice to Warrington during this process.

On March 20, 2010, when the loan matured, Warrington could not pay the amount due, and the loan went into default. Approximately nine months later, on January 25, 2011, the Bank filed a foreclosure action against Warrington in circuit court. On January 26, 2012, Warrington petitioned this Court in its original jurisdiction for declaratory relief. On March 8, 2012, this Court granted Warrington's petition and stayed further proceedings in the lower court pursuant to Rule 245, SCACR.

As these two cases, which the Court heard separately, involve the same legal issues, they have been consolidated for review. *See* Rule 214, SCACR ("Where there is more than one appeal from the same order, judgment, decision or decree, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order the appeal to be consolidated.").

## ISSUES

I. Whether lenders engage in the unauthorized practice of law by preparing and mailing loan modification documents to borrowers and recording the executed documents without the participation of a licensed attorney.

II. Whether the Court should deem Petitioners' mortgages void if the Court finds a loan modification completed without the involvement of a licensed attorney constitutes the unauthorized practice of law.[2]

---

2. The Bank also raised two additional issues. First, whether the master-in-equity's judgment for Bank based on Warrington's discovery abuse is res judicata as to Warrington's case, and whether Warrington waived his right for declaratory relief by participating in the foreclosure action in the lower court. This Court granted Warrington's petition for declaratory relief prior to the filing of the master-in-equity's judgment, and therefore no final judgment exist for res judicata to apply. Additionally, the Bank's waiver claim is not grounded in proper law or supported by appropriate argument, and is thus abandoned. *See In the Matter of the Care and Treatment of McCracken*, 346 S.C. 87, 92, 551 S.E.2d 235, 238 (2001) (holding an issue is deemed abandoned if the

## ANALYSIS

### I. Unauthorized Practice of Law

Petitioners allege that Central and the Bank (collectively, Respondents) engaged in the unauthorized practice of law by modifying a loan without the participation of a licensed attorney. We disagree.

 The South Carolina Constitution delegates the duty to regulate the practice of law in South Carolina to this Court. *See* S.C. Const. art. V, § 4; *In re Unauthorized Practice of Law Rules,* 309 S.C. 304, 305, 422 S.E.2d 123, 124 (1992); *see also* S.C.Code Ann. § 40-5-10 (2011). "The generally understood definition of the practice of law 'embraces the preparation of pleadings, and other papers incident to actions and special proceedings, and the management of such actions and proceedings on behalf of clients before judges and courts.'" *State v. Despain,* 319 S.C. 317, 319, 460 S.E.2d 576, 577 (1995) (quoting *In re Duncan,* 83 S.C. 186, 189, 65 S.E. 210, 211 (1909)). The practice of law, however, "is not confined to litigation, but extends to activities in other fields which entail specialized legal knowledge and ability." *State v. Buyers Serv. Co., Inc.,* 292 S.C. 426, 430, 357 S.E.2d 15, 17 (1987). The unauthorized practice of law jurisprudence in South Carolina is driven by the public policy of protecting consumers. *See In re Unauthorized Practice of Law Rules,* 309 S.C. at 307, 422 S.E.2d at 123 ("We hope by this provision to strike a proper balance between the legal profession and other professionals which will ensure the public's protection from the harms caused by the unauthorized practice of law."). For this reason, this Court has consistently refrained from adopting a specific rule to define the practice of law. *Id.* at 305, 422 S.E.2d at 124 (stating "it is neither practicable nor wise" to formulate a comprehensive definition of the practice of law). Instead, whether an activity constitutes the practice of law remains flexible and turns on the facts of each case. *Id.*

Previously, in *State v. Buyers Service Company, Incorporated,* 292 S.C. 426, 357 S.E.2d 15 (1987) and *Doe v. McMas-*

---

argument in the brief is not supported by authority or is only conclusory); *see also Solomon v. City Realty Co.,* 262 S.C. 198, 201, 203 S.E.2d 435, 436 (1974) (deeming a conclusory argument abandoned).

*ter*, 355 S.C. 306, 585 S.E.2d 773 (2003), this Court addressed the unauthorized practice of law in the context of real estate transactions. In *Buyers Service*, we divided the purchase of residential real estate into four steps: (1) title search; (2) preparation of loan documents; (3) closing; and (4) recording title and mortgage, and held that a licensed attorney must supervise each of these steps.[3] *Id.* at 430–34, 357 S.E.2d at 17–19 (emphasizing protection of the public as the paramount concern).

In *Doe v. McMaster*, 355 S.C. 306, 312, 585 S.E.2d 773, 776 (2003), the Court mandated attorney supervision for the refinancing of mortgages.[4] In that case, the lender attempted to distinguish *Buyers Service* by arguing that in *McMaster* the transaction centered on refinancing an existing mortgage rather than dealing with the purchase of a new property. *Id.* at 312, 585 S.E.2d at 776. We held this essentially a distinction without a difference because refinancing a mortgage entails the same four steps involved in purchasing a property. *Id.* *McMaster*, like *Buyers Service*, emphasized the public policy of advancing consumer interests. *Id.* at 311 n. 3, 585 S.E.2d at 776 n. 3 (citation omitted) ("[T]his Court grounds its unauthorized practice rules in the State's ability to protect consumers in the state and not as a method to enhance the business opportunities for lawyers.").

Petitioners argue loan modifications "change the existing terms of the legal rights of the parties" by altering interest rates and repayment terms. Petitioners further assert that because the modification agreements have a "legal effect," the agreements must constitute the unauthorized practice of law. We disagree.

---

3. *See also Doe Law Firm v. Richardson*, 371 S.C. 14, 18, 636 S.E.2d 866, 868 (2006) ("Viewed in isolation, it cannot be said that the disbursement of loan proceeds in and of itself "entail[s] specialized legal knowledge and ability," such that it constitutes the practice of law. . . . [H]owever, the disbursement of funds in the context of a residential real estate loan closing cannot and should not be separated from the process as a whole. Accordingly, we hold that the disbursement of the funds must be supervised by an attorney.").

4. *See also Matrix Fin. Servs. Corp. v. Frazer*, 394 S.C. 134, 139, 714 S.E.2d 532, 534–35 (2011) (holding a lender engaged in the unauthorized practice of law by refinancing a mortgage without attorney supervision).

This case is distinguishable from both *Buyers Service* and *McMaster*. A loan modification is an adjustment to an existing loan to accommodate borrowers who have defaulted. In contrast, refinancing is the issuance of an entirely new loan, often used by home owners to take advantage of lower interest rates. Thus, the same public policy that requires attorney supervision for home purchases and refinancing does not apply to loan modifications. Requiring attorney supervision over a loan modification would create a cost to the consumer outweighed by the benefit. Additionally, the existence of a robust regulatory regime and competent non-attorney professionals militates against extending the attorney supervision requirement to loan modifications.

Thus, we hold that lenders do not engage in the unauthorized practice of law by preparing and mailing loan modifications to borrowers and recording the executed documents without participation of a licensed attorney. Given our rejection of the allegation that Respondents practiced law without authorization, it is unnecessary to reach Petitioners' issue as to whether this Court should deem their mortgages void. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

## CONCLUSION

For the foregoing reasons, we hold that modifying a loan without attorney supervision does not constitute the unauthorized practice of law.

**JUDGMENT FOR RESPONDENTS.**

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., concurring in result only.