# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Ex Parte: Edward J. Westbrook, Petitioner,

In Re: The Murkin Group, LLC, Respondent.

Appellate Case No. 2018-002263

---

## ORIGINAL JURISDICTION

---

Opinion No. 27957
Submitted February 28, 2020 – Filed March 18, 2020

---

## JUDGMENT DECLARED

---

Edward J. Westbrook, of Richardson, Patrick, Westbrook
& Brickman, LLC, of Charleston, *pro se*.

Theodore von Keller, of Crawford & von Keller, LLC, of
Columbia, for Respondent.

---

**PER CURIAM:**   This case is before us in our original jurisdiction to determine
whether Respondent, the Murkin Group, LLC (Murkin), engaged in the
unauthorized practice of law (UPL).  We hold Murkin has engaged in UPL.

## UNDERLYING FACTS

In April 2017, the Wando River Grill (Restaurant) became dissatisfied with the
service of its linen supplier (Cintas) and Cintas' ability to supply the type of linens
Restaurant needed.  Restaurant contacted another supplier to secure some or all of

its required linens and notified Cintas of its need to suspend at least a portion of Cintas' services. Cintas claimed Restaurant's suspension of service constituted a breach of the parties' contract, invoked a liquidated damages provision in the contract, sought more than $8,000 in damages, and hired Murkin to collect the outstanding debt.[1] Petitioner, a South Carolina attorney, represented Restaurant in the resulting dispute.

In April 2018, Murkin sent a demand-for-payment letter to Restaurant demanding $8,106.43. Email communications followed between Murkin and Restaurant regarding Restaurant's issues with Cintas' past performance of the parties' contract and possible reinstatement of the contract, and Cintas' provision of linens. Murkin claimed Cintas would waive its damages claim if Restaurant paid a "one-time processing fee for the reinstatement" of services and signed certain "documentation that [Restaurant] need[ed]" to sign to reinstate Cintas' service. Murkin prepared and sent a reinstatement agreement to Restaurant with signature lines for Restaurant and "The Murkin Group, on behalf of Cintas Corporation – Charleston, SC."

Because the Murkin-prepared reinstatement agreement materially altered the terms of the parties' original contract and imposed new obligations on Restaurant and because the agreement's terms were contrary to discussions Cintas personnel had directly with Restaurant, Restaurant sent the proposed reinstatement agreement to Petitioner. Restaurant's manager also informed Murkin he was attempting to continue a dialogue with Cintas to resume Cintas' linen service, but Cintas personnel refused to respond. Murkin informed Restaurant's manager all communications were to be handled through Murkin.

After learning of Murkin's response to Restaurant manager, Petitioner contacted Murkin, indicated Restaurant had issues with Cintas' performance under the

---

[1] Murkin is a Florida limited liability company that provides debt collection services to its clients in exchange for a contingency fee. Murkin advertises itself as having "in-house collection specialists." Pursuant to its Service Agreement with its clients, once an account is turned over to Murkin, the client agrees to cease all communication with the debtor regarding the account and allow Murkin to be the sole point of contact. The Service Agreement provides that the client authorizes Murkin to act as its agent and to collect the accounts according to Murkin's policies and procedures. The agreement further provides, "In the event it becomes necessary to forward Client's Accounts to an attorney for legal action, Client directs and authorizes [Murkin], as its agent, to assign the Accounts to an attorney as designated by [Murkin] . . . . [Murkin] must receive authorization from the Client prior to filing a lawsuit or settling an account."

parties' contract, and requested Murkin have its South Carolina counsel contact him directly. In response, Murkin's representative stated, "Whether or not this gets forwarded to local counsel[] is a decision which our office will make, with our client, when we feel it appropriate," and reiterated any resolution of the matter would require Restaurant to sign Murkin's reinstatement agreement.

Restaurant did not sign the reinstatement agreement, and no South Carolina counsel for Murkin or Cintas contacted Petitioner. In response to Restaurant's refusal to sign, a Murkin representative emailed Petitioner and threatened the matter could "escalate, which potentially could cost your client a lot more[] if our clients [sic] wishes to file a suit action [sic], our attorney there[] would add on attorney fees, court costs, sheriff fees for service of process and, of course, accrued interest."[2] The Murkin representative stated that, if Murkin did not hear back from Petitioner, Murkin would assume Restaurant was not willing to resolve the balance, and the representative would "make . . . specific recommendations on how I feel Cintas should proceed."

In November 2018, Petitioner emailed Murkin asking for the South Carolina Bar numbers of several Murkin employees "if they are members of the Bar." The Murkin representative responded stating Petitioner's desire to deal with Murkin's local counsel "means nothing, since that is a decision made between our client and our office." The representative further claimed authority to bind any attorney to whom Murkin referred the matter to settle for no less than Murkin demanded, stating, "our attorneys, once they receive signed Suit Authorization documents, executed by our client, will not settle for less [than the $8,106.43 discussed in April 2018] . . . . [Our attorneys] will also be directed[] to not accept payment arrangements on the balance . . . ."

In December 2018, Petitioner filed a petition pursuant to the Court's request in *Medlock v. University Health Services, Inc.*, 404 S.C. 25, 28, 743, S.E.2d 830, 831 (2013), and *In re Unauthorized Practice of Law Rules*, 309 S.C. 304, 305, 422 S.E.2d 123, 124 (1992), that any individual who becomes aware of conduct that might constitute UPL should bring a declaratory judgment action in the Court's original jurisdiction.

---

[2] This communication was legally misleading as the linen service contract between Cintas and Restaurant did not allow a "[law]suit action," but required arbitration of any disputes. Additionally, the service contract did not provide for the recovery of attorney's fees.

We referred the matter to the Honorable Kristi F. Curtis as special referee to take evidence and issue a report containing proposed findings of fact and recommendations of law. The parties elected to move forward without discovery on a stipulation of facts. Oral arguments were held at the Sumter County Courthouse on September 20, 2019. Judge Curtis filed her report on September 30, 2019, recommending this Court find Murkin's actions constituted UPL. Murkin filed exceptions to the report. After careful consideration of the briefs and oral argument in this case, we hereby adopt Judge Curtis' recommendations and findings as discussed below.

In her proposed conclusions of law, Judge Curtis found Murkin went beyond the mere collection of a debt and crossed into UPL by:

(1) becoming involved in negotiating a contract dispute between Cintas and Restaurant and interposing itself between the parties for the purpose of negotiating a settlement on behalf of Cintas;

(2) purporting to advise Cintas as to what legal action it should take;

(3) indicating to Restaurant that it would advise Cintas as to whether to accept a settlement offer;

(4) purporting to control whether and when the case would be referred to an attorney;

(5) purporting to control the actions of the attorney and claiming it could direct the attorney not to settle the claim or make payment arrangements with Restaurant;

(6) threatening to file suit and making specific claims about what types of damages would be recoverable in the lawsuit; and

(7) giving legal opinions and interpreting the terms of the contract between Restaurant and Cintas.

## LAW

Pursuant to the South Carolina Constitution, this Court has the duty to regulate the practice of law in South Carolina. S.C. Const. art. V, § 4; *In re Unauthorized*

*Practice of Law Rules*, 309 S.C. at 305, 422 S.E.2d at 124; *see also* S.C. Code Ann. § 40-5-10 (2011) (stating the Supreme Court has inherent power with respect to regulating the practice of law).  The Court's duty to regulate the practice of law and the legal profession "is to protect *the public* from the potentially severe economic and emotional consequences which may flow from the erroneous preparation of legal documents or the inaccurate legal advice given by persons untrained in the law."  *Linder v. Ins. Claims Consultants, Inc.*, 348 S.C. 477, 468–87, 560 S.E.2d 612, 617 (2002).

This Court has long held the practice of law is not confined to litigation, but encompasses activities and actions in other areas that "entail specialized legal knowledge and ability."  *State v. Buyers Serv. Co.*, 292 S.C. 426, 430, 357 S.E.2d 15, 17 (1987).  However, the Court has also recognized "it is neither practicable nor wise to attempt a comprehensive definition" of what constitutes the practice of law but, instead, "to decide what is and what is not the unauthorized practice of law in the context of an actual case or controversy."  *In re Unauthorized Practice of Law Rules*, 309 S.C. at 305, 422 S.E.2d at 124.

In *Crawford v. Central Mortgage Co.*, the Court found a mortgage company's execution of loan modifications at the request of distressed borrowers did not constitute UPL because the loan modifications were merely adjustments to existing loans made to accommodate defaulted borrowers.  *Crawford*, 404 S.C. 39, 47, 744 S.E.2d 538, 542 (2013).  The *Crawford* Court held requiring attorney supervision over such actions would create a cost to the consumer that outweighed the benefit, and the existence of a robust regulatory regime and competent non-attorney professionals militated such requirements.  *Id.*  The instant matter is substantially different from *Crawford* in which the mortgage company was acting on its own behalf and not through a third party.  Here, Murkin is not a party to the contract between Restaurant and Cintas, but a third-party non-lawyer attempting to negotiate a contract modification on behalf of its client.

In *Roberts v. LaConey*, the respondent and a creditor entered into an assignment wherein the respondent agreed to collect a judgment in exchange for 66.6% of the amount recovered.  *Roberts*, 375 S.C. 97, 101, 650 S.E.2d 474, 476 (2007).  The respondent wrote letters to the debtor in which he offered legal opinions and made threats about the consequences the debtor would face if the debtor did not cooperate and satisfy the judgment.  The respondent further threatened the debtor with legal actions, including threatening to have the debtor "ARRESTED and brought to court in restraints the way Moses was brought before Pharaoh in the

movie, 'The Ten [C]ommandements.'" *Id.* at 102–03, 650 S.E.2d at 477. The *Roberts* Court found the purported "assignment" executed between the parties was actually an agreement to collect a debt for a fee; therefore, the respondent was not acting entirely on his own behalf, but on behalf of the original judgment holder. *Id.* The Court further held the respondent's preparing pleadings, filing documents with the circuit court in his own name, sending letters to the debtor that contained legal opinions, and identifying himself as "acting as 'Plaintiff's Attorney[]'" constituted UPL. *Id.* at 104–05, 650 S.E.2d at 478.

In *Linder*, the Linders hired ICC, a public insurance adjuster company, to assist with the filing of a claim with their insurance company after their home was damaged in a fire. *Linder*, 348 S.C. at 483–84, 560 S.E.2d at 615–16. ICC's advertisements described the company as a "professional Loss Consulting Firm" that represented their client's "best interest" in handling property damage claims. *Id.* at 484–85, 560 S.E.2d at 616. ICC also stated in a client fact sheet, "REMEMBER, your insurance company has already appointed a professional to protect THEIR interest. ICC WILL PROTECT YOURS!" *Id.* at 485, 560 S.E.2d at 616–17. The Linders entered into a contract with ICC in which they agreed to pay ICC a percentage of the amount the company recovered on their insurance claim. ICC notified the Linders' insurance company that ICC should be contacted for "any further information and negotiations" concerning the Linders' claim. *Id.* at 484, 560 S.E.2d at 616. When the Linders' insurance company rejected their claim for the full value of their gun collection, ICC advised the Linders the guns should be covered under their policy. *Id.* at 484, 560 S.E.2d at 616.

The *Linder* Court found public insurance adjusting was not *per se* UPL. However, the Court found ICC's adjusters impermissibly engaged in UPL when they (1) advised clients of their rights, duties, or privileges under an insurance policy regarding matters requiring legal skill or knowledge, i.e., interpreting the policy for clients; (2) advised clients on whether to accept a settlement offer from an insurance company; (3) became involved in the coverage dispute between the client and the insurance company; and (4) utilized advertising that would lead clients to believe that public adjusters provided services that required legal skill. *Id.* at 493, 560 S.E.2d at 621.

## DISCUSSION

In the instant case, Murkin—similarly to the respondent in *Roberts* and ICC in *Linder*—engaged in UPL when it interpreted Cintas' service contract with

Restaurant, gave legal opinions as to what damages were recoverable under the Cintas-Restaurant contract, sought to negotiate the contract dispute between Cintas and Restaurant, and purported to advise Cintas on whether to accept a settlement offer and to negotiate the amount of settlement.

Other states have addressed the issue of whether a collection agency engages in UPL when an agency specifically claims it controls, or implies it has the right to control, the actions of a licensed attorney. *See J.H. Marshall & Assocs. v. Burleson*, 313 A.2d 587, 594–95 (D.C. 1973) (finding collection agency that was, in essence, selling the services of a lawyer whom it controlled and directed engaged in UPL, and holding the agency could not "properly interpose itself between a creditor and an attorney seeking to collect the creditor's claim. To do so either directly or indirectly, by assignment or otherwise, has been held to be the unauthorized practice of law"); *see also State ex rel. State Bar of Wis. v. Bonded Collections, Inc.*, 154 N.W.2d 250, 256–59 (Wis. 1967) (holding collection agency that advised creditor when to file a lawsuit, hired an attorney, directed the attorney when to file suit, and directed the lawsuit, engaged in UPL); *Richmond Ass'n of Credit Men v. Bar Ass'n*, 189 S.E. 153, 158 (Va. 1937) (holding collection agency that (1) hired an attorney to perform collections, (2) retained the right to discharge him, (3) supervised his conduct, (4) gave him orders, and (5) received reports from him engaged in UPL).

In the instant case, Murkin similarly engaged in UPL when it purported to advise Cintas when to file suit, gave legal opinions on what types of damages would be sought, and purported to control the actions of the attorney and to direct the attorney not to settle the case or accept payment arrangements.

Finally, while Murkin characterizes its action as "debt collection," we agree with Judge Curtis' conclusion that the true nature of the underlying matter is a contract dispute. Restaurant was not delinquent in paying an invoice, nor had it refused to pay for services rendered. Restaurant terminated the service contract with Cintas prior to its expiration and, while the contract contained a liquidated damages clause, these alleged damages were not an admitted debt but a contract dispute. As Judge Curtis concluded:

> At the very [least], once Restaurant expressed issues with Cintas' performance under the Agreement and disputed whether it owed any additional monies to Cintas under the Agreement, this became a contract dispute. Murkin's agents then continued to represent Cintas

in the matter, advising Cintas on what legal action to take, advising Cintas when to turn the matter over to an attorney, interpreting the contract provisions, recommending settlement figures and purporting to advise Cintas on when to accept settlement, giving legal opinions as to what damages would be recoverable in a lawsuit, and purporting to control and direct any future attorneys who would work at Murkin's direction.  All of these actions constitute the unauthorized practice of law.

## CONCLUSION

Based on the forgoing, we find the record supports Judge Curtis' findings and hold Murkin's actions constituted UPL.  *See Buyers Serv. Co.*, 292 S.C. at 430, 357 S.E.2d at 17; *see also Crawford*, 404 S.C. at 47, 744 S.E.2d at 542; *Roberts*, 375 S.C. at 104–05, 650 S.E.2d at 478; *Linder*, 348 S.C. at 560 S.E.2d at 617.  We enjoin Murkin from engaging in any further such conduct.

**JUDGMENT DECLARED.**

**BEATTY, C.J., HEARN, FEW and JAMES, JJ., concur.  KITTREDGE, J., not participating.**